# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATE VIEMEISTER-HEESEMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No.: 20-cv-19582-MAS-LHG |
| ) | |
| EQUIFAX CREDIT INFORMATION ) | |
| SERVICES, L.L.C.; EXPERIAN ) | |
| INFORMATION SOLUTIONS, INC., ) | |
| ) | |
| Defendants. ) | |
| __ ) | |

## DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................. 2

    I.     THE TERMS OF USE AGREEMENT GOVERNING PLAINTIFF'S
           ACCOUNT ......................................................................................... 2

    II.    PLAINTIFF'S CLAIMS ARE SUBJECT TO ARBITRATION .......................... 9

LEGAL ARGUMENT ...................................................................................... 10

    I.     THE COURT SHOULD COMPEL THIS MATTER TO ARBITRATION ....... 10

           A.    Plaintiff's Claims Are Subject To Binding Arbitration .............. 11

           B.    A Valid Agreement To Arbitrate Exists ..................................... 13

           C.    Plaintiff's Claims Fall Within The Broadly-Worded Scope
                Of The Arbitration Clause ......................................................... 16

    II.    THE ACTION MUST BE STAYED PENDING ARBITRATION .................... 20

CONCLUSION ................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page**

<span style="font-variant: small-caps;">CASES</span>

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)........................................................................................................15

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)....................................................................................................14

*AT&T Tech., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986)....................................................................................................21

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006)....................................................................................................14

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
    207 F.3d 1126 (9th Cir. 2000) ...................................................................................20

*Collins & Aikman Products Co. v. Building Systems, Inc.*,
    58 F.3d 16 (2nd Cir. 1995)..........................................................................................22

*Coulter v Experian Information Solutions, Inc.*,
    2021 WL 735726 (E.D. Pa. Feb. 25, 2021) .................................................... *passim*

*Crawford v. Beachbody, LLC*,
    No. 14cv1583-GPC(KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014)..............18

*Davis v. Dell*,
    Civ. No. 07-630 (RBK) (AMD), 2007 U.S. Dist. LEXIS 94767 (D.N.J. Dec.
    28, 2007) ....................................................................................................................16

*E.M. Diagnostic Systems, Inc. v. Local 169, Intern. Broth. of Teamsters,*
    *Chauffeurs, Warehousemen and Helpers of America*,
    812 F.2d 91 (3rd Cir. 1987) .......................................................................................22

*Feldman v. Google, Inc.*,
    513 F. Supp. 2d 229 (E.D. Pa. 2007) ........................................................................16

*Gillette v. First Premier Bank*,
    No. 3:13-CV-432-LAB-RBB, 2013 WL 3205827 (S.D. Cal. June 24, 2013)........20

*Graf v. Match.com, LLC*,
No. CV 15-3911 PA, 2015 WL 4263957 (C.D. Cal. July 10, 2015) ................................17, 18

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000) ........................................................................................................15

*Griffin v. Burlington Volkswagen, Inc.*,
411 N.J.Super. 515 (2010) ............................................................................................22

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
139 S.Ct. 524 (2019) .....................................................................................................20

*In re Remicade (Direct Purchaser) Antitrust Litigation*,
938 F.3d 515 (3rd Cir. 2019) ........................................................................................22

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) ...............................................................................................15, 21

*Nguyen v. Barnes & Noble, Inc.*,
763 F.3d 1171 (9th Cir. 2014) ......................................................................................16

*Pentecostal Temple Church v. Streaming Faith, LLC*,
Civil Action No. 08–554, 2008 WL 4279842 (W.D. Pa. Sept. 16, 2008) .............................16

*Perry v. Thomas*,
482 U.S. 483 (1987) ......................................................................................................15

*Rent-A-Center W., Inc. v. Jackson*,
130 S. Ct. 2772 (2010) ..................................................................................................20

*Schwartz v. Comcast Corp.*,
256 Fed. Appx. 515 (3d Cir. 2007) ...............................................................................16

*Shearson/Am. Express v. McMahon*,
482 U.S. 220 (1987) ......................................................................................................15

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) ..........................................................................18

*Trippe Mfg. Co. v. Niles Audio Corp.*,
401 F.3d 529 (3d Cir. 2005) ..........................................................................................15

*Volt Info. Scis., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.*,
489 U.S. 468 (1989) ......................................................................................................15

*Willey v. J.P. Morgan Chase, N.A.*,
No. 09 Civ. 1397(CM), 2009 WL 1938987 (S.D.N.Y. July 7, 2009)......................................23

Experian Information Solutions, Inc., by and through its undersigned counsel, respectfully submits the following Memorandum of Law in support of its Motion to Compel Arbitration pursuant to section 4 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

## INTRODUCTION

This is an action under the Fair Credit Reporting Act ("FCRA").  The plaintiff, Kate Viemeister-Heesenan, alleges that Experian imposed a credit freeze on her file, but failed to inform her of that action.  She also claims that she tried, unsuccessfully, to get the credit freeze removed.  She alleges that, due to the imposition of the freeze, she was unable to open various new lines of credit.  She claims that Experian's action violated the FCRA, as well as New Jersey's Identity Theft Prevention Act, N.J.S.A. § 56:11, et seq.  On both counts, she maintains that Experian's actions were negligent and willful.  Experian now moves to compel Plaintiff's claims to arbitration.

Beginning in January 2019 and continuing through to the present day, Plaintiff has been enrolled in CreditWorks$^{SM}$—an Experian credit monitoring product.  The Terms of Use governing that service has an arbitration clause, which provides that Plaintiff and Experian agree to arbitrate "all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website … to the fullest extent permitted by law."  The term "Website" is defined as "https://usa.experian.com, or any affiliated website (including, but not limited to, Experian.com[.]"  Plaintiff's claims fall squarely within the arbitration clause.

On January 12, 2019, Plaintiff subscribed to CreditWorks.  Soon thereafter, she obtained a report through her CreditWorks subscription showing her accounts.  Two weeks later, she allegedly called Experian and was told that "she was part of a data breach and [Experian] needed to lock her credit[.]"  (ECF No. 1 at ¶ 13.)  The next day, Plaintiff obtained another report through her CreditWorks subscription showing her accounts.  Between June 2019 and June 2020, Plaintiff allegedly attempted to apply for credit—from student loans for her son to personal credit cards.

-1-

(*Id.* at ¶¶ 15-59.)  Plaintiff says that she was unable to open these new lines of credit due to the credit freeze on her file.  (*Id.*)  At the same time that she was applying for, but being denied, credit, Plaintiff monitored her accounts through her CreditWorks subscription.

As Plaintiff's claims against Experian "aris[e] out of or relat[e] to" her use of her CreditWorks subscription, they are subject to arbitration.  In *Coulter v. Experian*, the Honorable Nitza I. Quiñones Alejandro granted Experian's motion to compel arbitration, upholding the validity and enforceability of the arbitration clause in the ***same*** Terms of Use Agreement at issue here.  *See Coulter v Experian Information Solutions, Inc.*, 2021 WL 735726 (E.D. Pa. Feb. 25, 2021).

Thus, under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), Experian hereby moves for an order compelling this matter to arbitration, as required under Plaintiff's written agreement with Experian and, pursuant to Section 3 of the FAA, staying this action until arbitration has been completed.

## STATEMENT OF FACTS

### I.      THE TERMS OF USE AGREEMENT GOVERNING PLAINTIFF'S ACCOUNT

On January 12, 2019, Plaintiff enrolled in CreditWorks.  (*See* Declaration of David Williams (Williams Decl.), ¶ 3.)  In order to successfully enroll, Plaintiff had to complete various webforms.  (*Id.*)  The first form required Plaintiff to enter her personal information—*i.e.*, her name, address, phone number, and e-mail address.  (*Id.*, ¶ 3 and Ex. 1.)  After she entered her personal information, Plaintiff had to click the "Submit and Continue" button on the webform to continue with the enrollment process.  (*Id.*)  She clicked the "Submit and Continue" button, and was presented with a second form to complete.  (*Id.*)

The second webform required Plaintiff to enter her social security number, date of birth, and a username and password.  (*Id.*, ¶ 4.)  Immediately below the boxes to enter and confirm her

password, was the following disclosure:  "By clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy."  (*Id.*, ¶ 4 and Ex. 2.)  The phrase "Terms of Use Agreement" was off-set in blue text and, if clicked, would have presented the consumer with the full text of the agreement.  (*Id.*)  That is, the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use.  (*Id.*)  Immediately below the disclosure was a large purple button that reads: "Submit Secure Order."



(*Id.*)  The webform, the disclosure, and the "Submit Secure Order" button appeared on a single webpage.  (*Id.*)  After entering her information, Plaintiff clicked the "Submit Secure Order" order button, thereby accepting and agreeing to the Terms of Use Agreement.  (*Id.*)

-3-

The Terms of Use Agreement in effect when Plaintiff enrolled had a section entitled, "Amendments," which advised Plaintiff that she would be bound by the then-current Terms of Use each time she "order[ed], access[ed], or use[d]" any of the Services or Websites described in the agreement. (*Id.*, ¶ 5 and Ex. 3 (emphasis added).)[1]  After she enrolled in CreditWorks, Plaintiff continuously used her Service and the Websites—including throughout 2021—which binds her to the current version of the Terms of Use Agreement. (*Id.*, ¶ 5.)

The current (operative) version of the Terms of Use Agreement begins with the section, "Overview and Acceptance of Terms," which reads, in pertinent part:

### OVERVIEW AND ACCEPTANCE OF TERMS

You agree that by creating an account with ECS (as defined below), or accessing or using our Services (as defined below), website(s) (such as this website, https://usa.experian.com, or any affiliated website (including, but not limited to, **Experian.com, FreeCreditReport.com, FreeCreditScore.com, CreditReport.com, Creditchecktotal.com, CreditScore.com, usa.experian.com, and experian.experiandirect.com**)), or mobile applications (such as the Experian app), as well as any content provided or accessible in connection with the website(s) or mobile application(s), including information, user interfaces, source code, reports, images, products, services, and data (each website and mobile application referred to herein as a "Website," and collectively, as "Websites"), you represent to ECS that you have read, understood, and expressly consent and agree to be bound by this Terms of Use Agreement, and the terms, conditions, and notices contained or referenced herein ("Agreement") whether you are a "Visitor" (which means that you simply browse or access a Website), or a "Customer" (which means that you have created an account with ECS, or enrolled or registered with a Website, or are accessing or using a Service).

\*          \*          \*

For the avoidance of doubt, this Agreement expressly applies to: (a) your access to and use of the Websites; (b) any and all transactions between you and ECS through the Websites, including for the provision of any Services or of any credit, personal, financial or other information delivered as part of or in conjunction with free Services or paid Services, including any such

---

[1] Every subsequent version of the Terms of Use Agreement has the identical section on Amendments. (*Id.*, ¶ 5 and Ex. 4.)

information that may be archived to the extent made available on the Websites, such as (i) for your purchase of non-membership based Services such as the 3 Bureau Credit Report and FICO® Scores, the FICO Industry or other Base FICO Scores and/or an Experian Credit Report and FICO Score, (ii) enrollment and use of free Services (such as EXPERIAN CREDITWORKS℠ Basic), and/or enrollment, purchase and use of membership based Services (such as EXPERIAN CREDITWORKS℠ Premium, Experian IdentityWorks℠, or Experian Credit Tracker℠); and (iii) your access to and use of calculators, credit resources, text, pictures, graphics, logos, button items, icons, images, works of authorship and other information and all revisions, modifications, and enhancements thereto contained in the Websites.

You may not browse the Websites, or create an account or register with ECS, or use or enroll in any Services, and you may not accept this Agreement, if you are not of a legal age to form a binding contract with ECS. If you accept this Agreement, you represent that you have the capacity to be bound by it. Before you continue, you should print or save a local copy of this Agreement for your records.

**THE SERVICES AND WEBSITES ARE SUBJECT TO ALL TERMS AND CONDITIONS CONTAINED HEREIN AND ALL APPLICABLE LAWS AND REGULATIONS. PLEASE READ THIS AGREEMENT CAREFULLY. YOUR ACCEPTANCE OF, ORDER OF, USE OF, AND/OR ACCESS TO, THE SERVICES AND WEBSITES CONSTITUTES YOUR AGREEMENT TO ABIDE BY EACH OF THE TERMS AND CONDITIONS SET FORTH HEREIN. IF YOU DO NOT AGREE WITH ANY OF THESE TERMS OR CONDITIONS, DO NOT USE, ACCESS OR ORDER ANY SERVICE OR ACCESS OR USE THE WEBSITES. IF YOU HAVE ALREADY BEGUN ACCESSING OR USING THE SERVICES AND/OR WEBSITES AND DO NOT AGREE TO BE BOUND BY THIS AGREEMENT, IMMEDIATELY CEASE USING THE SERVICE OR WEBSITE AND/OR DISCARD ANY INFORMATION OR PRODUCTS YOU RECEIVED VIA ANY SERVICE OR WEBSITE (TO THE EXTENT APPLICABLE), AND CALL CUSTOMER CARE AT 1-855-962-6943 TO CANCEL YOUR ACCOUNT WITH ECS. NOTE, YOU MAY ALSO BE ABLE TO DEACTIVATE YOUR PAID SERVICE AND RETAIN YOUR ACCOUNT WITH ECS ONLINE, AS AND TO THE EXTENT EXPLAINED IN FURTHER DETAIL BELOW.**

(*Id.*, Ex. 4 (emphasis in original).)  The Terms of Use Agreement when Plaintiff enrolled has the same provision.  (*Id.*, Ex. 3.)

The Terms of Use Agreement also has a section entitled "Dispute Resolution By Binding Arbitration" which reads, in pertinent part:

## DISPUTE RESOLUTION BY BINDING ARBITRATION

PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.

SUMMARY:

MOST CUSTOMER CONCERNS CAN BE RESOLVED QUICKLY AND TO THE CUSTOMER'S SATISFACTION BY CALLING ECS'S CUSTOMER CARE DEPARTMENT AT 1-855-962-6943. IN THE UNLIKELY EVENT THAT ECS'S CUSTOMER CARE DEPARTMENT IS UNABLE TO RESOLVE A COMPLAINT YOU MAY HAVE REGARDING A SERVICE OR WEBSITE TO YOUR SATISFACTION (OR IF ECS HAS NOT BEEN ABLE TO RESOLVE A DISPUTE IT HAS WITH YOU AFTER ATTEMPTING TO DO SO INFORMALLY), WE EACH AGREE TO RESOLVE THOSE DISPUTES THROUGH BINDING ARBITRATION OR SMALL CLAIMS COURT INSTEAD OF IN COURTS OF GENERAL JURISDICTION TO THE FULLEST EXTENT PERMITTED BY LAW. ARBITRATION IS MORE INFORMAL THAN A LAWSUIT IN COURT. ARBITRATION USES A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY, ALLOWS FOR MORE LIMITED DISCOVERY THAN IN COURT, AND IS SUBJECT TO VERY LIMITED REVIEW BY COURTS. ARBITRATORS CAN AWARD THE SAME DAMAGES AND RELIEF THAT A COURT CAN AWARD. ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED. ECS WILL PAY ALL COSTS OF ARBITRATION, NO MATTER WHO WINS, SO LONG AS YOUR CLAIM IS NOT FRIVOLOUS. HOWEVER, IN ARBITRATION, BOTH YOU AND ECS WILL BE ENTITLED TO RECOVER ATTORNEYS' FEES FROM THE OTHER PARTY TO THE SAME EXTENT AS YOU WOULD BE IN COURT.

Arbitration Agreement:

(a) ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or

-6-

your use of any Website subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to:

claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

For purposes of this arbitration provision, references to "ECS," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service provider, CSID), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites. Notwithstanding the foregoing, either party may bring an individual action in small claims court. You agree that, by entering into this Agreement, you and ECS are each waiving the right to a trial by jury or to participate in a class action to the maximum extent permitted by law. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. This arbitration provision shall survive termination of this Agreement.

*       *       *

(c) . . . The arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. If the AAA is unavailable or refuses to arbitrate the parties' dispute for any reason, the arbitration shall be administered and conducted by a widely-recognized arbitration organization that is mutually agreeable to the parties, but neither party shall unreasonably withhold their consent. If the parties cannot agree to a mutually agreeable arbitration organization, one shall be appointed pursuant to Section 5 of the Federal Arbitration Act. In all events, the AAA Rules shall govern the parties' dispute. The AAA Rules are available online at www.adr.org, by calling the AAA at 1-800-778-7879, or by writing to the Notice Address. The AAA Rules may change from time to time, and you should review them periodically.

-7-

All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable. However if putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party, then the court shall have the power to decide whether this agreement permits class or representative proceedings. The arbitrator shall be bound by the terms of this Agreement and shall follow the applicable law. In this regard, the arbitrator shall not have the power to commit errors of law or legal reasoning, and any award rendered by the arbitrator that employs an error of law or legal reasoning may be vacated or corrected by a court of competent jurisdiction for any such error. Unless ECS and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the final arbitration hearing will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Except as otherwise provided for herein, ECS will pay all AAA filing, administration and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse ECS for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules.

\*    \*    \*

(f) YOU AND ECS AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. Further, unless both you and ECS agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. The arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. If this specific subparagraph (f) is found to be unenforceable in its entirety, then the entirety of this arbitration provision shall be null and void. However, if only a portion of this subparagraph (f) is found to be unenforceable, then the unenforceable portion of the

provision shall be stricken, and the remainder of subparagraph (f) enforced. Any claims not subject to individual arbitration under applicable law shall be stayed in a court of competent jurisdiction pending completion of the individual arbitration.

(*Id.*, Ex. 4 (emphasis in original).)  The Terms of Use Agreement when Plaintiff enrolled likewise has an arbitration provision.  (*Id.*, Ex. 3.)

## II.   <u>PLAINTIFF'S CLAIMS ARE SUBJECT TO ARBITRATION</u>

In late 2018 or early 2019, Plaintiff allegedly sought to obtain a car loan, but the lender was having difficulty accessing her credit.  (ECF No. 1 at ¶ 12.)  On or about January 25, 2019, Plaintiff claims that she called Experian and was told that she was part of a data breach and needed to lock her credit.  (*Id.*, ¶ 13.)  Plaintiff alleged that she "did not authorize a lock during at this time or at any time before or after."  (*Id.*, ¶ 14.)  During that same time, Plaintiff obtained reports through her CreditWorks subscription showing her accounts.  (Williams Decl., ¶ 6.)

In June 2019, Plaintiff claims that she began applying for student loans for her son to attend college.  (ECF No. 1 at ¶ 15.)  She alleged that her "loan application was denied as the lender was unable to access [her] credit file because of a lock."  (*Id.*, ¶ 16.)  During June 2019, Plaintiff obtained five reports through her CreditWorks subscription showing her accounts.  (Williams Decl., ¶ 7.)  On or about July 2, 2019, Plaintiff claims that she "applied for a loan and received an email from Defendant Experian that it blocked the inquiry 'because your Experian credit file is locked.'"  (ECF No. 1 at ¶ 20.)  After several attempts to get the freeze lifted, *see id.*, ¶¶ 21-32, Plaintiff, on July 18, 2019, "applied for a loan and was told by both the lender and Defendant Experian that it was blocked because Plaintiff's 'Experian credit file is locked.'"  (*Id.*, ¶ 33.)  That same day, Plaintiff obtained several reports through her CreditWorks subscription showing her accounts.  (Williams Decl., ¶ 8.)  On or about July 20, 2019 Plaintiff claims that she "was able to obtain the student loan."  (ECF No. 1 at ¶ 34.)

In February 2020, Plaintiff alleged that she applied for a credit card with Chase.  (*Id.*, ¶ 36.)
She claims that "Chase informed [her] that it could not access her credit file from Defendant
Experian 'because of safeguards you requested from the credit reporting agency.'"  (*Id.*, ¶ 37.)
In mid-February 2020, Plaintiff obtained another report through her CreditWorks subscription
showing her accounts.  (Williams Decl., ¶ 9.)  On June 24, 2020, Plaintiff allegedly applied for
student loans for her son.  (ECF No. 1 at ¶ 43.)  That same day, Plaintiff obtained another report
through her CreditWorks subscription showing her accounts.  (Williams Decl., ¶ 9.)  On June 29,
2020, "the prospective lender informed Plaintiff that it was unable to access Plaintiff's credit file
due to a security freeze."  (ECF No. 1 at ¶ 57.)  On June 30, 2020, "the prospective lender again
tried to access Plaintiff's credit report but was blocked."  (*Id.*, ¶ 59.)  Two weeks later, however,
Plaintiff claims that she "finally was able to obtain a loan on the basis of her Equifax credit report."
(*Id.*, ¶ 79.)  In August, she allegedly was "able to obtain a car loan[.]"  (*Id.*, ¶ 80.)

Based upon the foregoing, Plaintiff claims that Experian negligently and willfully failed to
notify her of a credit freeze on her file, and negligently and willfully failed to remove the credit
freeze when requested to do so.  (*Id.*, ¶¶ 88-101, 107-120.)  She further alleges that Experian
negligently and willfully failed to maintain reasonable procedures to ensure the maximum possible
accuracy of credit information appearing in consumer reports to third parties in violation of
Section 1681e(b) of the FCRA.  (*Id.*, ¶¶ 102-106.)[2]

## LEGAL ARGUMENT

## I.      THE COURT SHOULD COMPEL THIS MATTER TO ARBITRATION

The FAA provides that "[a] party aggrieved by the alleged failure … of another to
arbitrate under a written agreement for arbitration may petition any United States district court

---

[2] This latter claim is irreconcilable with Plaintiff's allegations that prospective lenders were
unable to access her credit file at Experian due to the presence of a credit freeze.

which, save for such agreement, would have jurisdiction . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

This Court should issue an order compelling this matter to arbitration because the Terms of Use Agreement is an enforceable contract that broadly encompasses "all disputes and claims between [Plaintiff and Experian] arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration."  (Williams Decl., Exs. 3 and 4.)  It further provides that "[t]his agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law."  (*Id.*)  It also provides that "[t]he agreement to arbitrate includes, but is not limited to:  claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act), fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement."  (*Id.*)

### A.      Plaintiff's Claims Are Subject To Binding Arbitration

Section 2 of the FAA mandates that binding arbitration agreements in contracts "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  This provision "reflect[s] both a 'liberal federal policy favoring arbitration' and

the 'fundamental principle that arbitration is a matter of contract,'" such that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.").

The FAA promotes a "liberal federal policy favoring arbitration agreements," and "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration*." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Perry v. Thomas*, 482 U.S. 483, 490 (1987) (stating that arbitration agreements falling within the scope of the FAA "must be 'rigorously enforce[d]'" (citations omitted)).  The FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Info. Scis., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).  The court "must resolve 'any doubts concerning the scope of arbitrable issues ... in favor of arbitration.'" *Moses H. Cone*, 460 U.S. at 24-25.

Pursuant to the FAA, arbitration must be compelled where, as here: (1) a valid agreement to arbitrate exists; and (2) the arbitration agreement encompasses the claims at issue.  *See Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). An arbitration agreement governed by the FAA, like the arbitration agreement here, is presumed to be valid and enforceable*. See Shearson/Am. Express v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985). Indeed, there is a presumption in favor of arbitrability.  *Trippe*, 401 F.3d at 532. The party seeking to evade arbitration bears the burden of showing that the arbitration

provision is invalid or does not encompass the claims at issue.  *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

As demonstrated below, the arbitration clause in Plaintiff's Terms of Use Agreement is valid and, although the question of the arbitrability of her claims ultimately is for an arbitrator to decide, the controversy between Plaintiff and Experian clearly falls within the arbitration clause's broadly-worded scope.

**B.    A Valid Agreement To Arbitrate Exists**

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."  *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).  Courts within this Circuit routinely enforce internet agreements where, as here, the user is required to affirmatively acknowledge the agreement before proceeding with use of the website.  *See, e.g.*, *Davis v. Dell*, Civ. No. 07-630 (RBK) (AMD), 2007 U.S. Dist. LEXIS 94767, at *14 (D.N.J. Dec. 28, 2007) ("when a party uses his computer to click on a button signifying his acceptance of terms and conditions in connection with an online transaction, he thereby manifests his assent to an electronic agreement."); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007) (finding reasonable notice of and mutual assent to the terms contained in the Ad Works contract because "the user here had to . . . click the 'Yes, I agree to the above terms and conditions' button in order to proceed to the next step . . . .  If the user did not agree to all of the terms, he could not have activated his account . . . ."); *Schwartz v. Comcast Corp.*, 256 Fed. Appx. 515, 520 (3d Cir. 2007) (same); *Pentecostal Temple Church v. Streaming Faith, LLC*, Civil Action No. 08–554, 2008 WL 4279842, at *5 (W.D. Pa. Sept. 16, 2008) (relying on *Schwartz*, and noting that  "Third Circuit has recently held that a customer on notice of contract terms available on the internet website

is bound by those terms"). "Absent a showing of fraud, failure to read an enforceable clickwrap agreement, as with any binding contract, will not excuse compliance with its terms." *Feldman*, 513 F. Supp. 2d at 236.

As a matter of law, Plaintiff agreed to the Terms of Use Agreement because: (1) she had clear notice of the Terms of Use, (2) she was admonished immediately above the "Submit Secure Order" button that, "By clicking "Submit Secure Order": I accept and agree to your **Terms of Use Agreement**, as well as acknowledge receipt of your **Privacy Policy** and **Ad Targeting Policy**" and (3) she clicked the "Submit Secure Order" button, thereby manifesting her assent to the Terms of Use. Numerous courts, under indistinguishable facts, have found that website users were bound by the Terms of Use.

Indeed, in the recent *Coulter v. Experian* matter, Judge Alejandro granted Experian's motion to compel arbitration, upholding the validity and enforceability of the arbitration clause in the ***same*** Terms of Use Agreement at issue here. *See Coulter*, 2021 WL 735726. The court ruled that "reasonable notice was provided when Defendant's website advised Plaintiff that "**[b]y clicking 'Submit Secure Order': [He] accept[s] and agree[s] to [their] Terms of Use Agreement . . .**" *Id*. at *5 (emphasis in original). The court further found that "[t]he full Terms of Use Agreement, readily available to Plaintiff by clicking on the highlighted link, contained the Arbitration Provision entitled 'DISPUTE RESOLUTION BY BINDING ARBITRATION.'" *Id*. The court also explained that, "[b]y clicking the 'Submit Secure Order' button, Plaintiff manifested his assent to the Terms of Use Agreement." *Id*. In short, "[b]ecause Plaintiff had reasonable notice and manifested his assent, . . . the Terms of Use Agreement and the Arbitration Provision therein constitute a valid agreement to arbitrate." *Id*. This Court should rule in the same manner.

-14-

Similarly, in *Graf v. Match.com, LLC*, No. CV 15-3911 PA (MRWx), 2015 WL 4263957 (C.D. Cal. July 10, 2015), the district court ruled that users of Match.com's website agreed to an arbitration provision in the Terms of Use "when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review." *Id*. at *4. Just as in *Graf*, the Terms of Use at issue here were expressly referenced and hyperlinked in the disclosure located immediately above the "Submit Secure Order" button; and the disclosure stated that by clicking the "Submit Secure Order" button, the online user was accepting the Terms of Use.

*Crawford v. Beachbody, LLC*, No. 14cv1583-GPC(KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014), also is indistinguishable from the facts at hand. There, the district court found that the plaintiff had agreed to a forum selection clause found in a website's Terms and Conditions. Just like here, the plaintiff in *Crawford* "had to click an orange button that read 'PLACE ORDER.'" *Id*. at *3. Above the button the following text was presented to the plaintiff: "By clicking Place Order below, you are agreeing that you have read and understand the Beachbody Purchase Terms and Conditions, and Team Beachbody Terms and Conditions." *Id*. Just like here, "[t]he terms 'Terms [of] [Use]' were in blue font while the rest of the language in the sentence was in [black] font, which was hyperlinked to the full text of the Terms and Conditions." *Id*.

*Fteja v. Facebook* also is indistinguishable from the facts at hand. There, Facebook.com had disclosed: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." 841 F. Supp. 2d at 835. Plaintiff likewise was warned: "By clicking "Submit Secure Order": I accept and agree to your **Terms of Use Agreement**, as

-15-

well as acknowledge receipt of your **Privacy Policy** and **Ad Targeting Policy**." *See also Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) (enforcing Terms of Use because the plaintiff "was required to and did click on an 'Accept' button directly above a statement that clicking on the button served as assent to the [website's] terms of service along with a blue hyperlink directly to the terms of service").

The Terms of Use Agreement expressly allows affiliates of Experian Consumer Service ("ECS") to invoke the agreement's arbitration clause:

> For purposes of this arbitration provision, references to "ECS," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service provider, CSID), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites.

(Williams Decl., Exs. 3 and 4.)  Defendant Experian Information Solutions, Inc. is an affiliate of ECS.  (*Id.*, ¶ 2.)

In sum, by disclosing to users they are agreeing to the Terms of Use Agreement, and requiring affirmative action by the user to assent to those terms, Plaintiff is bound by the Terms of Use Agreement.  Thus, a valid agreement to arbitrate exists between Plaintiff and Experian.  *See Coulter*, 2021 WL 735726 at *5.

### C.   Plaintiff's Claims Fall Within The Broadly-Worded Scope Of The Arbitration Clause

If there is any question as to whether Plaintiff's claims fall within the scope of the arbitration clause contained in the Terms of Use Agreement, that issue is to be decided by an arbitrator in the first instance:

> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to

resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement[.]

(Williams Decl., Ex. 3.)  Where, as here, the parties have clearly and unmistakably agreed that the arbitrator should decide the validity and applicability of an arbitration provision, the FAA "'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)); *Rent-A-Center W., Inc. v. Jackson*, 130 S. Ct. 2772, 2777 (2010) (same); *Henry Schein, Inc. v. Archer and White Sales, Inc.*, ---U.S.---, 139 S.Ct. 524, 527-530 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.").

Indeed, in *Coulter*, Judge Alejandro explained that "the Arbitration Provision's Delegation Clause provides that '[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision' and grants the arbitrator 'exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.'"  2021 WL 735726 at *4.  The court found that "[t]his provision constitutes a 'clear and unmistakable' delegation clause under *Henry Shein* and delegates the exclusive authority to resolve 'all issues' to the arbitrator, including the 'scope and enforceability' of the Arbitration Provision." *Id*.  In short, because the Terms of Use Agreement makes an unambiguous expression of intent to arbitrate arbitrability, any question over whether Plaintiff's claims fall within the arbitration clause are for an arbitrator to decide.  *Id*.;

-17-

*Gillette v. First Premier Bank*, No. 3:13-CV-432-LAB-RBB, 2013 WL 3205827 at *2 (S.D. Cal. June 24, 2013) ("Given the parties' agreement to arbitrate gateway issues of arbitrability, there is actually very little here for the Court to decide.  There's simply no disputing that the credit card application Gillette filled out, as well as the subsequent credit card contract, contain an agreement to arbitrate.  This being the case, the Court's work is more or less done.").

But even if there had not been such delegation, where, as here, the parties have entered into a valid arbitration agreement, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).  That is, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Mitsubishi Motors*, 473 U.S. at 626.  Where an arbitration clause is broadly worded, there is a heightened presumption of arbitrability, such that "'[in] the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'"  *AT&T Tech.*, 475 U.S. at 650 (quoting *United Steelworkers*, 363 U.S. at 582-83).

Here, at the outset, the Terms of Use Agreement admonishes:  "For the avoidance of doubt,  this Agreement expressly applies to . . . any and all transactions between you and ECS through the Websites, including for the provision of any Services or of any credit, personal, financial or other information delivered as part of or in conjunction with free Services or paid Services . . . ."  (Williams Decl., Exs. 3 and 4.)  The arbitration clause provides that "all disputes and claims between us arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law" are "subject to arbitration."  (*Id.*)  It further provides

-18-

that "[t]his agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law." (*Id.*)  It then provides that "[t]he agreement to arbitrate includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute[.]" (*Id.*)

Like all other jurisdictions, New Jersey courts treat the phase "arising out of" and "relating to" in an arbitration clause as "extremely broad." *See Griffin v. Burlington Volkswagen, Inc.*, 411 N.J.Super. 515, 518 (2010).  The Third Circuit has emphasized that "where the arbitration provision is a broad one, and '[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *E.M. Diagnostic Systems, Inc. v. Local 169, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 812 F.2d 91, 95 (3rd Cir. 1987); *see also In re Remicade (Direct Purchaser) Antitrust Litigation*, 938 F.3d 515, 525 (3rd Cir. 2019) ("Courts have generally read the terms 'arising out of' or 'relating to' [in] a contract as indicative of an 'extremely broad' agreement to arbitrate any dispute relating in any way to the contract. [Citation]  Such broad clauses have been construed to require arbitration of any dispute between the contracting parties that is connected in any way with their contract." [Citation]); *see also Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16, 20 (2nd Cir. 1995) ("'Any claim or controversy arising out of or relating to th[e] agreement' is the paradigm of a broad clause." (citing *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 251 (2d Cir. 1991).)  That being the case, if "the allegations underlying the claims 'touch matters' covered by the parties' ... agreement[], then those claims must be arbitrated[.]" *Id.* (citations omitted).

Here,  Plaintiff's claims against Experian plainly "touch matters" covered by the arbitration clause.   Indeed, during the entire relevant time period that Plaintiff allegedly was unable to open new lines of credit due to the presence of a credit freeze on her Experian file, she obtained numerous reports from Experian showing her credit file.  Furthermore, claims under the FCRA are governed by a two-year statute of limitations, which is triggered on the date of discovery of an alleged violation.  *See* 15 U.S.C. § 1681p; *Willey v. J.P. Morgan Chase, N.A.*, No. 09 Civ. 1397(CM), 2009 WL 1938987, at \*4 5 (S.D.N.Y. July 7, 2009).  Information that Plaintiff obtained through the her use of her CreditWorks service would place her on notice.  For all of these reasons, Plaintiff's claims are subject to arbitration.

## II.     THE ACTION MUST BE STAYED PENDING ARBITRATION

Section 3 of the FAA expressly provides that where, as here, a valid arbitration agreement requires a dispute to be submitted to binding arbitration, the district court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  Because Plaintiff must be compelled to arbitrate her claims, the action should be stayed pending completion of arbitration.

## CONCLUSION

For the foregoing reasons, Experian respectfully requests that the Court grant this Motion, enter an order directing Plaintiff to arbitrate her claims against Experian, and stay this action pending the completion of arbitration.

Dated:  August 27, 2021                    Respectfully submitted,


                                           _/s/ Dorothy A. Kowal_____
                                           Dorothy A. Kowal
                                           Price, Meese, Shulman & D'Arminio, PC
                                           50 Tice Boulevard
                                           Woodcliff Lake, New Jersey 07677
                                           T: 201-391-3737
                                           dkowal@pricemeese.com
                                           Counsel for Defendant Experian Information
                                           Solutions, Inc.